#### IN THE UNITED STATES DISTRICT COURT
#### FOR THE EASTERN DISTRICT OF PENNSYLVANIA

| | |
|---|---|
| UNITED STATES OF AMERICA : | |
| : | CRIMINAL NO. 23-381 |
| v. : | |
| : | |
| KAREEM BARKSDALE : | |

#### MEMORANDUM OPINION

**Goldberg, J.**                                                                                                                                    **March 26, 2024**

Defendant Kareem Barksdale is charged with one count of possession with intent to distribute one kilogram or more of a mixture and substance containing phencyclidine (21 U.S.C. § 841(a)(1) and (b)(1)(A)); one count of possession with intent to distribute marijuana for renumeration (21 U.S.C. § 841(a)(1) and (b)(1)(D)); one count of possession of a firearm in furtherance of drug trafficking (18 U.S.C. § 924(c)(1)(A)(i)); and one count of possession of a firearm by a felon (18 U.S.C. § 922(g)(1)). Defendant now moves to suppress: (1) all physical evidence seized on March 29, 2023 from inside Apartment 912 at the Metro Club Condominiums, 201 North 8th Street, Philadelphia, Pennsylvania; (2) all physical evidence seized from inside a 2022 black Subaru; and (3) all allegedly tainted evidence derivatively obtained as a result of the searches. The Government opposes the Motion.

I held a suppression hearing on February 28, 2024. For the following reasons, I will deny the Motion to Suppress.

**I.      FACTUAL BACKGROUND**

On March 28, 2023, officers submitted to a judge of the Philadelphia Court of Common Pleas applications for search warrants for Unit 912 of the Metro Club Condominiums in Philadelphia, PA, Defendant's black Subaru, seven other residences, and one other vehicle. (Govt. Ex. A, at 13–14; Govt. Ex. B, at 13–14.) The applications sought to recover any controlled substances, drug paraphernalia,

books/records relating to drug transactions, money/proceeds, and firearms and ammunition. Officer Ray Sima submitted an affidavit (the "Affidavit") detailing the investigation in support of all the applications.

The applications were prompted by several months of investigation. According to the Affidavit, on January 26, 2023, members of the Philadelphia Police Department's Narcotics Field Unit Squad 4A were informed by a narcotics strike force officer that drugs were being sold from 5018 Griscom Street. A confidential informant told officers that a black male with the nickname of "Vodka," along with a Hispanic female named Shelly, were supplying that address with crack cocaine, PCP, and marijuana, and that sales would be made from that address. (Govt. Ex. A p. 003.)[1]

The Affidavit then indicates that, on the same day, police observed multiple unknown persons approach the back window on the first floor of 5018 Griscom Street, engage in conversation, and then retrieve a small item from the person in the window. This occurred multiple times over several hours. Officer Sima, the affiant and a member of the Narcotics Bureau at the Philadelphia Police Department, believed these transactions to be consistent with narcotics sales. (Id.)

Over the next two months, the Narcotics Field Unit ("NFU") team executed multiple methods of surveillance of 5018 Griscom Street, five controlled buys from that location, and other investigation of the involved individuals. The Affidavit details these events as follows:

- **January 31, 2023** - Two officers met with a confidential informant ("CI") and gave the CI $40 to purchase crack cocaine from the back window of 5018 Griscom Street. At 12:15 p.m. the CI engaged a Hispanic female, identified as Ashley Matos, in conversation in the window, handed Matos the buy money, and received four purple "flip tops" containing crack cocaine. The officers continued to observe multiple hand-to-hand transactions between Matos and unknown persons from the same window which were consistent with narcotics sales. (Id. at 003–004.)

- **February 2, 2023** – Officers conducted surveillance of 5018 Griscom Street and observed two black males—one of whom was later identified as Lenward Mitchell a/k/a Vodka—exit the front door dragging a plastic bin and a red shoe box. They entered a red Tesla (which was a rental) and drove to a large garage area at 1666 Allengrove Street. The males were in the garage for about 12–15 minutes, after which they returned to 5018 Griscom Street, and brought in a large black weighted-

---

[1] Because the affidavits in support of both of the challenged search warrants are identical, I refer solely to Government Exhibit A. In addition, I use the pagination added by the Government in the bottom center of each page.

down trash bag, a red bag, and a yellow bag.  For the next several hours, police observed hand-to-hand transactions from the rear window of Griscom Street.  (Id. at 004.)

- **February 6, 2023** – Officers observed Mitchell making hand-to-hand transactions from the rear window of 5018 Griscom Street.  A short time later, Mitchell exited the property and entered a white Nissan Maxima, which police were unable to follow.  The owner of the Maxima was listed as Keaha Thomas of 1534 W Glenwood Ave, which is the same address Mitchell uses for identification purposes.  (Id. at 004.)

- **February 7, 2023** – Officers set up surveillance on 5018 Griscom Street and observed Mitchell enter the premises.  At 3:15 p.m., they saw Ashley Matos out front engaging in numerous hand-to-hand transactions with unknown persons.  At approximately 5:00 p.m., she left in a gray Ford Taurus and drove to 2800 C Street, where she exited while concealing something underneath her jacket.  She later returned to 5018 Griscom Street and exited the vehicle, appearing to be concealing something under her jacket.  A records check revealed that the Ford Taurus was owned by Ashley Matos.  (Id. at 004–005.)

- **February 8, 2023** – Officers conducted surveillance on 5018 Griscom Street and observed Mitchell and, shortly after, Matos enter the property holding a brown bag.  Mitchell left the property in the white Nissan Maxima.  Matos left shortly after in her gray Ford Taurus, which police followed to 6311 Hergerman Street.  Matos entered Hergerman Street and then drove back to 5018 Griscom Street.  Police attempted to purchase narcotics from 5018 Griscom Street and were advised by Matos that they were "closed" right now.  (Id. at 005.)

- **February 13, 2023** – Officers conducted surveillance on 5018 Griscom Street and observed Mitchell walking on the east side of the block talking to a group of males.  At 5:30 p.m., a black male holding a black duffle bag with some apparent weight to it was standing out front of 5018 Griscom Street.  Mitchell approached the male and took possession of the black duffle without engaging in conversation.  Mitchell then entered 5018 Griscom with the bag.  Thereafter, officers observed numerous hand-to-hand transactions for small items with an unknown male.  (Id. at 006.)

- **February 14, 2023** – Officers conducted surveillance on 5018 Griscom Street and observed Mitchell enter the property with a brown bag after pulling up in a white Nissan Maxima.  Officers then observed several unknown persons approach the rear window of the property and engage in conversation, after which the unknown person would hand cash in exchange for a small item with Mitchell.  The officers then armed a CI with $100 in buy money to purchase crack cocaine from 5018 Griscom Street.  They observed the CI approach the back window, engage Mitchell in conversation, hand over the buy money, and receive a small item in his hand.  When the CI returned to the officers, he handed over ten clear glass vials with blue tops containing a substance that tested positive for cocaine base.  In the same time frame, officers also observed hand-to-hand transactions between Mitchell and other unknown persons.  (Id. at 006–007.)

- **February 15, 2023** – Officers conducted surveillance on 5018 Griscom Street and observed numerous hand-to-hand transactions for small items.  At approximately 9:00 p.m., one officer attempted to follow Mitchell as he left in his white Nissan Maxima, but the officer lost him in the traffic.  (Id. at 007.)

- **February 16, 2023** – Officers conducted surveillance on 5018 Griscom Street and observed several unknown persons making hand-to-hand transactions with Mitchell from the rear window of the

3

property (cash in exchange for small items). Officers met with a CI and gave him $60 of buy money. The CI approached the property, spoke with Mitchell through the window. Another black male came to the side door, took the buy money from the CI, and dropped a small item into the CI's palm. The item tested positive for cocaine base. The same CI conducted a second controlled buy later that day with $40. After a similar set of events, the CI returned with marijuana. (Id. at 008.)

- **February 20, 2023** – Officers observed Mitchell leave 5018 Griscom Street and enter his Maxima and park at 1500 West Glenwood Ave with a satchel bag and red cereal box. Officers followed him until he parked his vehicle in the entrance ramp at 201 N. 8th Street (the Metro Club Condos) and entered at 9:47 a.m. with the satchel bag. He left at 11:06 a.m. with the same bag, which he tossed in the vehicle. He reentered the Metro Club and returned to his vehicle shortly after with a drink and snacks. Officers lost him in traffic. They then continued surveillance on 5018 Griscom Street and spotted the same the same black male who had previously sold the CI drugs. Several unknown individuals approached him, and he handed them designer ziplock packets of what appeared to be marijuana which matched the previous CI buy. Mitchell then arrived and entered the property and then later left carrying a black/white cylinder bag. Over the next several hours, officers observed hand-to-hand transactions from the back and side windows of the property. (Id. at 008-009.)

- **February 21, 2023** - Officers conducted surveillance on 5018 Griscom Street and observed Ashley Matos exiting and entering her Ford Taurus. Mitchell arrived at 8:18 a.m., walked over to a white work van with a PPA boot on it, retrieved paperwork from the windshield, and entered the property. Thereafter, Mitchell left in his Maxima, and officers lost him in traffic. (Id. at 009.)

- **February 22, 2023** – Officers conducted surveillance on 5018 Griscom Street and observed the white Maxima parked nearby. At 8:40 a.m., Mitchell entered the car carrying a white bag and blue jacket and proceeded to the Metro Club Condos. At 10:20 a.m., Mitchell was observed walking out from the lobby of the Metro Club Condos and getting back into his Maxima. He drove to 1700 Scattergood Street, entered, and then exited a few minutes later with a black item placed on the front seat. (Id. at 009-010.)

- **March 1, 2023** – Officers conducted surveillance on 5018 Griscom Street and observed Matos exit with a white bag and leave in her Taurus. Mitchell then drove to 1776 Scattergood Street after which he returned to 5018 Griscom Street. For the next several hours, hand-to-hand transactions occurred there. (Id. at 010.)

- **March 9, 2023** – Pursuant to a court order, Narcotics Field Unit officers put a mobile tracking device onto Mitchell's vehicle. The tracker showed Mitchell traveling from 1500 W Glenwood Avenue to the Metro Club Condos and then continuing to the 5000 block of Griscom Street, where he was observed retrieving a black trash bag from the rear seats and bringing it inside. At approximately 1:40 p.m., he went to the 1700 block of Scattergood Street, exited several minutes later, and returned to 5018 Griscom Street. The most frequented stops that day were 1500 W Glenwood Ave, 5000 Griscom Street, 1700 Scattergood Street, and the Metro Club Condos. (Id. at 010-011.)

- **March 16, 2023** – Officers went to the Metro Club Condos and spoke to management, who provided police access to the video surveillance footage that covers the main lobby, the floor elevator lobbies, and secured parking lots. Officers observed Mitchell entering the Metro Club Condos on March 15, 2023, and taking the elevator to the ninth floor. Surveillance showed Mitchell taking pictures in the lobby of the ninth-floor elevator lobby, which pictures matched those on his public Instagram account. Mitchell exited his building shortly after arriving, while talking on his phone. The occupant

4

of Condo 912 was identified as Michael Rawls who parked a black Subaru in the secured lot right next to a white Dodge Charger. (Id. at 011–012.)

- **March 20, 2023** – Officers observed Mitchell return to the Metro Club Condos. Security footage from Friday, March 17, 2023, showed Mitchell going to the ninth floor and returning holding a black trash bag and gray and black shoe box. A short time later, police camera footage showed Mitchell carrying the same black trash bag into 5018 Griscom Street. Surveillance footage from Saturday, March 18, 2023, showed Mitchell again entering the Metro Club Condos and going to the ninth floor while carrying a black bag and red satchel bag, while accompanied by a tall black male, identified as Michael Rawls who resided in Unit 912. Officers also observed several emails between the occupant of Unit 912 and the building management which yielded an email address of "building withpeem" and a header indicating the name "Kareem Barksdale." A workup on Barksdale revealed that Kareem Barksdale's nickname was "Peem." Record checks showed that a male, which resembled the stature and physical appearance of "Mike Rawls,"—was listed as the occupant of Unit 912 at the Metro Club Condos—was identified as Kareem Barksdale. (Id. at 012–013.)

- **March 22, 2023** – Officers of the Narcotics Field Unit armed a CI with $100 in buy money for crack cocaine. The CI approached the side window of 5020 Griscom Street and engaged a person through the window. The CI handed the person the money and, seconds later, received a small item which later tested positive for cocaine base. For the next several hours, officers witnessed similar hand-to-hand transactions at 5018 and 5020 Griscom Street. (Id. at 013.)

- **March 23, 2023** – Officers observed Mitchell arrive at the 5000 block of Griscom Street inside a Chevy Suburban. He exited with a black and gray shoe box and entered a white work van parked in the area. Mitchell then proceeded to 1700 Scattergood Street in the work van, which police determined was owned by Keaha Thomas. Mitchell entered and exited 1776 Scattergood within minutes and then drove to the Metro Club Condos holding a black and gray shoe box. Mitchell proceeded to the 9th floor and, after several hours, returned to the elevator holding a bag and accompanied by Barksdale, wheeling a white electric bicycle with a large brown bag. Once outside, Mitchell took the brown bag from Barksdale and placed it and another bag into the white van. (Id. at 013–014.)

- **March 27, 2023** – Officers armed a CI with $100 buy money for PCP and marijuana. The CI went to 5018 Griscom Street, engaged in conversation with an unknown person, handed the buy money, and returned with PCP and marijuana. Later that same day, officers used the CI to conduct a second controlled buy, which yielded cocaine base. (Id. at 014.)

Based on the foregoing, Officer Sima requested a search warrant for (1) 1534 Glenwood Avenue, as the main address for Mitchell; (2) 6311 Hergerman Street, as the main address for Ashley Matos; (3) 5016-5018 Griscom Street Apts. B, C and D, as the locales for many of the observed drug transactions, (4) 1776 Scattergood Street, as Mitchell was observed repeatedly going between this address and 5000 Griscom Street; (5) 201 North 8th Street (Metro Club Condos), as Mitchell was observed multiple times at this location retrieving items from this area and travelling to 5016-5018 and 5020 Griscom Street; (6)

5

5020 Griscom Street, as it contained the window from which numerous drug transactions were observed to have been made; (7) a white Nissan Maxima used by Mitchell; and (8) a black Subaru Outback used by Kareem Barksdale.

On March 28, 2023, a Philadelphia Court of Common Pleas judge approved the warrants, and the following day, the searches were executed. Inside Unit 912 at the Metro Club Condos, police found, among other things, PCP and marijuana, two handguns, and a large amount of U.S. currency. Defendant Kareem Barksdale was arrested inside the master bedroom. The search of the Subaru yielded various paperwork.

On January 23, 2024, Defendant filed the instant Motion to Suppress the evidence recovered from the search of Unit 912 of the Metro Club Condos ("Unit 912") and the black Subaru.

## II.   STANDARD OF REVIEW

When reviewing a magistrate judge's determination of probable cause to issue a warrant, a district court should "[pay] great deference" to the magistrate's decision. Illinois v. Gates, 462 U.S. 213, 236 (1983). This standard means that "the resolution of doubtful or marginal cases in this area should be largely determined by the preference to be accorded to warrants." United States v. Ventresca, 380 U.S. 102, 109 (1965). If a substantial basis exists to support the probable cause finding, the court must uphold that finding even if it or a "different magistrate judge might have found the affidavit insufficient to support a warrant." United States v. Conley, 4 F.3d 1200, 1205 (3d Cir. 1993) (quoting United States v. Jones, 994 F.2d 1051, 1057 (3d Cir. 1993)).

Such deference, however, "does not mean that reviewing courts should simply rubber stamp a magistrate's conclusions." United States v. Tehfe, 722 F.2d 1114, 1117 (3d Cir. 1983). Rather, the duty of the reviewing court is to "ensure that the state district justice had a 'substantial basis' for concluding that the affidavit supporting the warrant established probable cause." United States v. Mortimer, 387 F. App'x 138, 140 (3d Cir. 2005) (citing Jones, 994 F.2d at 1054); see also Conley, 4 F.3d at 1205 ("Keeping in mind that the task of the issuing magistrate is simply to determine whether there is a fair

6

probability that contraband or evidence of a crime will be found in a particular place, a reviewing court is to uphold the warrant as long as there is a substantial basis for a fair probability that evidence will be found.") (internal quotation marks omitted).

## III.   DISCUSSION

Defendant Barksdale seeks to suppress all items seized from Unit 912 of the Metro Club Condos and the black Subaru claiming that the Affidavit lacked probable cause. Defendant asserts that, during the initial month of the investigation, when Mitchell and Matos were observed going to multiple locations in Philadelphia with different bags, Mitchell was never once seen going to or from the Metro Club Condominiums. Defendant notes that only after February 20, 2023, did officers observe Mitchell traveling to the 9th floor of the Metro Club, but they never actually saw him entering or exiting Unit 912. He also claims that he was seen only once leaving the Metro Club Condos with a bag before returning to Griscom Street. He points out that while he was twice seen in the presence of Mitchell at the elevator, there was only one occasion where they were seen together in the parking lot and where he handed Mitchell a bag that he placed in a white van. Finally, Defendant argues that the Affidavit provided no background information suggesting that he was previously or currently involved in any drug activity; it did not indicate what relationship Defendant had with Mitchell or Matos; and it offered no information that he was linked to any of the other locations under surveillance. In short, Defendant asserts that the Affidavit lacked sufficient facts showing any connection or nexus between criminal activity and Unit 912 or the Subaru.

The Government responds that the Affidavit was more than sufficient to substantiate the judge's finding of probable cause. In addition, it contends that even assuming probable cause was questionable, the good faith exception to the exclusionary rule merits denial of Defendant's Motion. For the reasons set forth below, I agree with the Government.

### A. Whether Probable Cause Existed for the Warrants for Unit 912 of the Metro Club Condos and the Black Subaru

The Fourth Amendment to the United States Constitution prohibits "unreasonable searches and seizures." U.S. Const. amend. IV. For a search to be reasonable under the Fourth Amendment, it must be effectuated with a warrant based on probable cause. See United States v. Burton, 288 F.3d 91, 102 (3d Cir. 2002) (citing Payton v. New York, 445 U.S. 573, 586 (1980)). Probable cause is a "commonsense, practical question," which is analyzed under a "totality-of-the-circumstances approach." Illinois v. Gates, 462 U.S. 213, 230 (1983).

In reviewing a magistrate's probable cause determination, the United States Court of Appeals for the Third Circuit has directed that a district court must "confine[] itself to the facts that were before the magistrate judge, i.e., the affidavit, and . . . not consider information from other portions of the record." United States v. Mortimer, 387 F. App'x 138, 140 (3d Cir. 2005) (quotations omitted). A finding of probable cause does not require direct evidence "linking the place to be searched to the crime." United States v. Hodge, 246 F.3d 301, 305 (3d Cir. 2001) (quoting United States v. Conley, 4 F.3d 1200, 1207 (3d Cir. 1993)). Rather, when basing a probable cause determination on a police affidavit, the judge must "read the entire affidavit in a 'commonsense and nontechnical manner.'" United States v. Hopkins, 220 F. App'x 155, 157 (3d Cir. 2007) (quoting United States v. Whitner, 219 F.3d 289, 296 (3d Cir. 2000)). While undergoing such a reading, a magistrate must determine "whether, based on the totality of the circumstances, 'there is a fair probability that contraband or evidence of a crime will be found in a particular place' . . . ." Id. (quoting Hodge, 246 F.3d at 305); see also Jones, 994 F.2d at 1055 (holding that in situations where the search warrant is directed at a property, not a person, there must be "probable cause to believe that instrumentalities or evidence of crime will be found." (quoting United States v. Tehfe, 722 F.2d 1114, 1117 (3d Cir. 1983)).

"When the crime under investigation is drug distribution, a magistrate may find probable cause to search the target's residence even without direct evidence that contraband will be found there." United

States v. Stearn, 597 F.3d 540, 559 (3d Cir. 2010). Indeed, the Third Circuit has long recognized that evidence associated with drug dealing "needs to be stored somewhere," and a drug dealer's dwelling is often "the best, and probably the only, location to store [such] items. . . ." United States v. Whitner, 219 F.3d 289, 298; see also Hodge, 246 F.3d at 306 ("It is reasonable to infer that a person involved in drug dealing on such a scale would store evidence of that drug dealing at his home."). The affidavit, however, must do more than suggest "only that the suspect 'is actually a drug dealer' and 'that the place to be searched is possessed by, or the domicile of the [suspect].'" United States v. Williams, 974 F.3d 320, 351 (3d Cir. 2020) (quoting Burton, 288 F.3d at 104). Furthermore, the "search of a drug dealer's home would be unreasonable if the affidavit suggested no reason to believe contraband would be found there." Stearn, 597 F.3d at 559. Thus, where an affidavit is based on circumstantial evidence connecting the residence to an occupant's illegal activity, but not directly implicating the residence itself, there must be evidence supporting "three preliminary premises: (1) that the person suspected of drug dealing is actually a drug dealer; (2) that the place to be searched is possessed by, or the domicile of, the dealer; and (3) that the home contains contraband linking it to the dealer's drug activities." Burton, 288 F.3d at 104.

Beyond the Burton inference, however, "searches of other residences separate and apart from a drug dealer's primary residence are appropriate that the property is being used for drug dealing, such as for purposes of serving as a stash house." United States v. Barnes, No. 23-cr-12, 2023 WL 5000035, at *3 (Aug. 4, 2023) (finding sufficient evidence that suspected drug dealer was seen entering an apartment empty handed, remaining inside for a brief period, and exiting with black plastic bags that appeared to be full). Indeed, the Third Circuit has found that "[e]ven were [a drug dealer] not in possession of the property, it is well established that when an individual is otherwise suspected of trading in narcotics, his comings-and-goings from a property further support a finding of probable cause to search that property." United States v. Torres, No. 22-2108, 2023 WL 332758, at *2 (3d Cir. Jan. 20, 2023); see also United States v. Alexander, 54 F. 4th 16, 173–742 (3d Cir. 2022) (finding sufficient evidence that suspected drug dealer exited a stash house before selling cocaine to the informant and carried heavy bags in

9

multiple trips between the stash house and the residence); <u>Stearn</u>, 597 F.3d at 557 (noting that where address appeared to be a focal point of drug conspirators' movements among properties, probable cause existed to search that property); <u>United States v. Basking</u>, 853 F. App'x 783, 786 (3d Cir. 2021) (noting that because drug dealers often maintain and use multiple properties to spread out and conceal their drugs, evidence of a confirmed dealer's movements among multiple property links each location and provides adequate probable cause).

Upon review of the Affidavit at issue here, I find that the alleged facts created a fair probability that contraband or evidence of a crime would be found both at Unit 912 and in the black Subaru.

Numerous pieces of evidence connected the drug dealing on Griscom Street with Unit 912 of the Metro Club Condos. According to the Affidavit, as of February 16, 2023, officers had conducted three controlled buys at 5018 Griscom Street and thereafter began tracking Mitchell's movements.[2] On February 20, 2023, Officers observed Mitchell drive to 201 N. 8th Street—the Metro Club Condos—and enter with a satchel bag. After approximately an hour and fifteen minutes, he returned with the same bag, which he tossed in his car. Mitchell then drove back to 5018 Griscom Street carrying a black/white cylinder bag. On February 22, 2023, officers again observed Mitchell leave from 5018 Griscom Street with a white bag and proceed to the Metro Club Condos. He stayed briefly before travelling to 1700 Scattergood Street, where he obtained a black item, before returning to 5018 Griscom Street.

The visits to the Metro Club Condos continued. On March 9, 2023, with the assistance of a tracking device, officers tracked Mitchell leaving from 1500 W Glenwood Ave to the Metro Club Condos, and then traveling to the 5000 block of Griscom Street carrying a black trash bag. Over the course of the following days, the mobile tracking device confirmed that Mitchell's most frequented stops

---

[2] Defendant argues that during the first month of the investigation, Mitchell was never once seen going to or from the Metro Club Condos. According to the Affidavit, however, at that time, officers either did not regularly track Mitchell's movements or lost Mitchell in traffic.

10

included 1500 W Glenwood Ave, 5000 Griscom Street, 1700 Scattergood Street, and the Metro Club Condos.

On March 16, 2023, the investigating officers spoke with management at the Metro Club Condos and viewed footage from Wednesday, March 15, 2023. The footage showed Mitchell entering the lobby at 10:25 a.m., shaking the hand of the front desk man, and taking an elevator to the 9th floor. Once off the elevator, Mitchell made a left turn into the occupancy wing. Management explained that the only condos in that wing were units 909, 910, 911, and 912. Management further advised that 909 was vacant, 910 was occupied by a couple, 911 was occupied, and 912 was occupied by a gentleman. The surveillance footage also showed a male, identified as Mike Rawls who resided in Unit 912, enter the elevator from the ninth floor and arrive in the lobby several seconds later. While police were on location at the Metro Club Condos on March 16th, Mitchell arrived and proceeded up to the 9th floor into the left hallway wing while talking on his telephone. He then returned to his car and went back to 5000 Griscom Street. Officers also again observed the occupant of Unit 912, who management re-identified as Mike Rawls, enter from a black Subaru (registered in the name of his company, El Jugo LLC), which was parked next to a white Dodge Charger.

Officers later reviewed surveillance footage from Friday, March 17, 2023, which showed Mitchell walking into the lobby of the Metro Club Condos, turning left towards units 909, 910, 911, and 912, and returning a short time later holding a black trash bag and gray and black shoe box, which he subsequently carried into 5018 Griscom Street. Surveillance footage from Saturday, March 18, 2023, showed Mitchell again returning to the Metro Club Condos, going to the left wing on the ninth floor, and walking back to the elevators with a black bag and red satchel bag, accompanied by a tall black male that management again identified as Michael Rawls in Unit 912. The two men entered the elevator together, talking the whole time, after which Mitchell entered a silver SUV and Rawls entered a black Subaru.

The officers then learned that the name "Michael Rawls" was an alias Defendant used to lease the unit in the Metro Club Condos. Records provided by Metro Club management indicated that Rawls used an email address of "buildingwithpeem" and a header of Kareem Barksdale. Review of police records revealed that Kareem Barksdale's nickname was "Peem," and that his driver's address was 4418 N. Gratz Street in Philadelphia. A record check on 4418 Gratz Street showed that the Subaru and Charger seen at the Metro Club Condos were registered to that address. Additionally, police observed a male who had the same stature and physical appearance as "Mike Rawls" from Unit 912 of the Metro Club Condos and noted that he was identified as Kareem Barksdale residing at 4418 N. Gratz Street, Philadelphia.

On March 23, 2023, police observed Mitchell take a work van from 5000 Griscom Street, drive briefly to 1700 Scattergood Street, and then drive to the Metro Club Condos holding a black and gray shoe box. Based on conversations with management, police confirmed that Mitchell got off the elevator and walked to the left wing where Unit 912 is located, and then, hours later, walked back to the elevator with Defendant who was wheeling a bicycle with a large brown bag on it. Once outside, Mitchell took the brown bag from Defendant, put it in his car, and drove to Griscom Street.

Based on the totality of the facts presented, I find that the magistrate properly determined that there was a fair probability that drugs or other contraband would be found in Unit 912. Through multiple controlled buys and days of observation at 5018 Griscom Street, police were able to unmistakably tie Mitchell to drug dealing at that location. Thereafter, Mitchell had numerous trips—confirmed both by police observation and GPS tracker information—between Griscom Street and the Metro Club Condos during which he was carrying various bags, satchels, or bins in and out of the Metro Club, which were later seen being brought to Griscom Street. Although police were originally unsure of which Unit on the 9th floor Mitchell was entering, building management narrowed the location to only four units, one of which was not occupied. Mitchell was then twice observed getting onto the elevator with the known occupant of Unit 912—Defendant Barksdale—during which the two men were talking and carrying

12

various items together.  Officers also confirmed that the occupant of Unit 912 was living under a false alias, using the name Mike Rawls.  See United States v. Byrd, 813 F. App'x 57, 61 (3d Cir. 2020) (use of an alias contributes towards a finding of probable cause).

Regarding the black Subaru, police confirmed, through PennDOT records, that the vehicle's registered address was 4412 North Gratz Street, which was the same address on Defendant Barksdale's driver's license.  According to the Affidavit, Defendant was twice seen entering or exiting the Subaru from the Metro Club parking lot, once after Defendant had been visited by Mitchell in his apartment.  Moreover, the police discovered that Defendant had the Subaru registered to an LLC, again indicating an intent to conceal.  Based on all of this information, the magistrate judge could reasonably determine that probable cause existed to believe that evidence of drug-trafficking activity would be found in the Subaru.

"While ideally every affidavit would contain direct evidence linking the place to be searched to the crime, it is well established that direct evidence is not required for the issuance of a search warrant.  Instead, probable cause can be, and often is, inferred by 'considering the type of crime, the nature of the items sought, the suspect's opportunity for concealment and normal inferences about where a criminal might hide [evidence of the crime].'"  United States v. Jones, 994 F.2d 1051, 1056 (3d Cir. 1993) (quoting United States v. Jackson, 756 F.2d 703, 705 (9th Cir. 1985)).  Moreover, "[t]he issuing judge or magistrate may give considerable weight to the conclusions of experienced law enforcement officers regarding where evidence of a crime is likely to be found and is entitled to draw reasonable inferences about where evidence is likely to be kept, based on the nature of the evidence and the type of offense." United States v. Whitner, 219 F.3d 289, 296 (3d Cir. 2000) (quotations omitted).

Here, the officers, applying their training and experience to the facts before them, reasonably inferred that Mitchell was a drug dealer and was carrying drugs and other contraband back and forth between the center of the operations on Griscom Street and the Metro Club Condos.  Based on observation, security footage, and conversations with Metro Club Condo Management, Officers were

13

able to associate Mitchell with Defendant, who resided in Unit 912 under an alias.[3]  Officers also witnessed Defendant using his black Subaru, registered under an LLC rather than in his own name. Taking these facts together, the state court judge had more than a sufficient basis on which to determine that probable cause existed for a search of both Unit 912 and the Subaru.

      **B.**     **<u>Whether the Good Faith Exception to the Exclusionary Rule Applies</u>**

Even assuming probable cause was lacking, the good faith exception applies and permits admission of the evidence obtained pursuant to the search warrants.

The fact that a magistrate judge may lack a sufficient basis for his/her probable cause determinations does not warrant the "extreme sanction of exclusion." <u>United States v. Leon</u>, 468 U.S. 897, 926 (1984).  In <u>Leon</u>, the Supreme Court established the good faith exception to the exclusionary rule, holding that if an officer obtains a warrant and executes it in good faith, "there is no police illegality and thus nothing to deter." <u>Id.</u> at 921.  "Accordingly, a court should not suppress evidence seized under a warrant's authority, even if that warrant is subsequently invalidated, unless 'a reasonably well trained officer would have known that the search was illegal despite the magistrate's authorization.'" <u>United States v. Stearn</u>, 597 F.3d 540, 561 (3d Cir. 2010) (quoting <u>United States v. Zimmerman</u>, 277 F.3d 426, 436 (3d Cir. 2002) (quoting <u>Leon</u>, 468 U.S. at 922 n.23)).  Although there are "narrow circumstances" where the good faith doctrine is not sufficient to override a warrant's lack of probable cause, as a general rule, the "mere existence of a warrant . . . suffices to prove that an officer conducted a search in good

---

[3]     Defendant contends that Mitchell's last visit to the Metro Club Condos occurred six days prior to the application for the search warrants, and, as such, the information was "stale."

While stale information "may have little value in showing that contraband or evidence is likely to be found in the place for which the warrant is sought," <u>United States v. Williams</u>, 124 F.3d 411, 420 (3d Cir. 1997), the age of the evidence supporting a search warrant is but one factor in the probable cause calculus and a mere lapse of time is not dispositive. <u>United States v. Harvey</u>, 2 F.3d 1318, 1322 (3d Cir. 1993); <u>United States v. Zimmerman</u>, 277 F.3d 426, 434 (3d Cir. 2002).  In the context of an ongoing narcotics investigation, periods of weeks or even months between an act giving rise to probable cause and the warrant application do not necessarily render the information stale. <u>United States v. Gallo</u>, 110 F. App'x 265, 267-68 (3d Cir. 2004) (holding that evidence of drug dealing was not stale due to twenty-day interval between controlled buy and search of suspect's home).  As such, a lapse of merely six days between the last visit to Metro Club and the warrant application does not render the information too stale for purposes of a probable cause evaluation.

faith" and obviates the need for "any deep inquiry into reasonableness." Stearn, 597 F.3d at 561 (quoting United States v. Hodge, 246 F.3d 301, 308 (2001)). In short, "[t]he test for whether the good faith exception applies is 'whether a reasonably well trained officer would have known that the search was illegal despite the magistrate's authorization." United States v. Caesar, 2 F.4th 160, 169–170 (3d Cir. 2021) (quoting United States v. Loy, 191 F.3d 360, 367 (3d Cir. 1999) (further quotations omitted)).

"To trigger the exclusionary rule, law enforcement conduct must be 'deliberate, reckless, or grossly negligent,' or involve 'recurring or systemic negligence.'" United States v. Caesar, 2 F.4th 160, 169–170 (3d Cir. 2021) (quoting Herring v. United States, 555 U.S. 135, 143–44 (2009)). In such rare circumstances, a warrant may be so flawed that "the officer will have no reasonable grounds for believing that [it] was properly issued." Leon, 468 U.S. at 923 (footnote omitted). Courts have identified four such situations in which the good faith exception does not apply:

> (1) where the magistrate judge issued the warrant in reliance on a deliberately or recklessly false affidavit;
> (2) where the magistrate judge abandoned his or her judicial role and failed to perform his or her neutral and detached function;
> (3) where the warrant was based on an affidavit so lacking in indicia of probable cause as to render official belief in its existence entirely unreasonable; or
> (4) where the warrant was so facially deficient that it failed to particularize the place to be searched or the things to be seized.

United States v. Tracey, 597 F.3d 140, 151 (3d Cir. 2010); see also Leon, 468 U.S. at 923.

Defendant asserts several arguments in an effort to avoid application of the good faith exception. First, he contends that the fact that the state court judge approved multiple different warrants based on one affidavit "underscores the lack of attention the state court judge gave to the probable cause determination for each individual location and further renders any official belief in the true existence of probable cause to search Apartment 912 and the Subaru entirely unreasonable." (Def.'s Mot. 20.) As set forth in detail above, however, the various search warrants were accompanied by a detailed Affidavit connecting each of the locations to be searched to the overall pattern of movement of the drug dealing being investigated. The mere number of locations for which the judge approved warrants does not create

15

any inference that the judge simply abdicated the duty to ensure that probable cause existed for each of the locations.  See United States v. Kaplan, No. 06-cr-719, 2009 WL 3806277, at *19 (E.D. Pa. Nov. 13, 2009) ("If Defendants mean to imply that the length of the affidavits led the magistrates simply to rubber stamp the warrants, the Court rejects this implication as unsupported by any evidence.").

Defendant also argues that the warrants were facially deficient because they authorized the seizure of "evidence of drug activity, in particular heroin, as well as firearms and ammunition, where there was no mention of any heroin dealing or firearms activity in this case."  However, "[m]ultiple courts have recognized that there is a 'well-known and attested-to link between drug distribution and firearms.'"  United States v. Hogan, No. 16-cr-215, 2017 WL 6372135, at *7 (M.D. Pa. Dec. 13, 2017) (collecting cases).  Accordingly, it was reasonable for the issuing judge to infer that firearms were likely to be found at the subject properties.  See United States v. Green, No. 21-cr-36, 2022 WL 22308176, at *8 (W.D. Pa. Feb. 28, 2022) (noting the connection between drug distribution and firearms).  Moreover, the mere fact that the warrant authorized a search for heroin (of which there was no evidence) along with cocaine, PCP, and marijuana (of which there was evidence) did not undermine the otherwise extensive probable cause.

Finally, Defendant asserts that "[t]he fact that police had information not disclosed to the state court judge in the Affidavit that there were seven units to the left of the elevator, as opposed to four units, and that Mitchell, based on a sign-in sheet the police obtained, may have been visiting Apartment 910, as opposed to 912, further militates against any findings of good faith in this case."  (Def.'s Mot. 20.)

As to the discrepancy regarding the number of units to the left of the elevator, the Affidavit clearly states that the officers obtained the information about the ninth-floor layout from building management.  The parties have stipulated that Officer Sima, the affiant, would testify that he was told by the building manager that there were four units on the wing of that hallway.  (N.T. 2/28/24, 42:15–23.)  Nothing in the Affidavit suggests that the officers visited the ninth floor themselves prior to seeking

16

the warrants, and Defendant points to nothing which would have made officers question what was represented to them by building management.[4]

As to the sign-in sheet where Mitchell indicated he was visiting Unit 910 instead of Unit 912, the absence of this information on the Affidavit does not obviate probable cause or otherwise suggest that the good faith exception should not apply. The parties have stipulated that Officer Sima would testify as to his understanding that everyone who visits the Metro Club Condos is supposed to fill in a visitor log. Mitchell, however, seemed to know the front desk manager well enough that he just waved and went up the elevator every time. Once police indicated that they were investigating visits by Mitchell to the unit, the building manager directed the front desk manager to have Mitchell sign in. (N.T. 2/28/24, 44:5–18.) According to the Government's evidence, Mitchell was first asked to fill in a sign-in sheet when entering the Metro Club Condos on March 16, 2023. When Mitchell signed in, he wrote that he was visiting Unit 910 and entered his name as "James." (Govt. Ex. C.) Given the falsity of Mitchell's name entry, as well as security footage showing Mitchell conversing on two occasions with the resident of Unit 912, and never with any occupant of Unit 910, officers applied their experience and discredited his reported visit to Unit 910. (N.T. 2/28/24, 45:1–8.) Accordingly, the omission of the sign-in sheet information was not material to the existence of probable cause. See United States v. Yusuf, 461 F.3d 374, 383 (3d Cir. 2006) (holding that a defendant must prove by a preponderance of the evidence that the omissions were material or necessary to the probable cause determination).

---

[4] Defendant offered the testimony of Diane Cowan, a private investigator, who spoke to Patrick Yasko, the property manager at the Metro Club Condos. According to Ms. Cowan, Mr. Yasko indicated that he did not recall telling law enforcement that there were only four units to the left of the elevator on the ninth floor and, if that question had been posed to him, he would have gone to the ninth floor to ensure that he was providing the correct information and would have also provided a floor plan. (N.T. 2/28/24, 40:22–41:5.)

The manner for challenging the truthfulness of factual statements made in an affidavit of probable cause supporting a warrant is a hearing pursuant to Franks v. Delaware, 438 U.S. 154 (1978). At a Franks hearing, a defendant must ultimately prove by a preponderance of the evidence that: (1) the affiant knowingly and deliberately, or with a reckless disregard for the truth, made false statements or omissions that create a falsehood in applying for a warrant; and (2) that such statements or omissions were material, or necessary, to the probable cause determination. United States v. Yusuf, 461 F.3d 374, 383 (3d Cir. 2006). At the suppression hearing, defense counsel affirmatively represented that he was not making a Franks motion regarding the truthfulness of the affiant's statements. (N.T. 2/28/24, 46:17–25.)

In short, I find that Defendant has failed to establish that any of the "rare circumstances" exist that rendered the Affidavit here so flawed that the officers were not justified in reliance on it. Accordingly, I will deny Defendant's Motion to Suppress. An appropriate Order follows.