**IN THE UNITED STATES DISTRICT COURT**
**FOR THE EASTERN DISTRICT OF PENNSYLVANIA**

| | | |
|---|---|---|
| **UNITED STATES OF AMERICA** | : | |
| | : | |
| **v.** | : | **CRIMINAL NO. 23-381-1** |
| | : | |
| **KAREEM BARKSDALE** | : | |

**MEMORANDUM**

**Marston, J.**                                                                                      **May 18, 2026**

Before the Court is Defendant Kareem Barksdale's Motion to Vacate, Set Aside, or

Correct a Sentence pursuant to § 2255.  (*See* Doc. Nos. 54, 59.)  For the reasons discussed below,

that motion is denied.

**I.      BACKGROUND**

**A.      Underlying Facts[1]**

In January 2023, members of the Philadelphia Police Department's Narcotics Field Unit

received a tip from a confidential informant ("CI") that a male with the nickname "Vodka" was

supplying crack, crack cocaine, PCP dipped cigarettes, and marijuana from the apartments at

5018 Griscom Street in Philadelphia.  (Plea Hr'g. Tr. at 33:9–18.)  After receiving this tip, the

Narcotics Field Unit Squad 4A conducted surveillance at the address provided and initiated

several controlled buys using CIs between January and March 2023.  (*Id.* at 33:19–24.)  For each

buy, the CI completed the purchase through either a first-floor window at 5018 Griscom Street or

a side window at 5020 Griscom Street.  (*Id.* at 34:3–7.)  During their surveillance, the Narcotics

Unit observed "Vodka," who was later identified as Lenward Mitchell, presiding over the street

---

[1] These facts are taken from the recitation of facts provided by the Government at the change of
plea hearing on April 11, 2024 (Plea Hr'g. Tr. at 33:9–41:6 (Doc. No. 41)), which Barksdale agreed was
an accurate summary of "what happened" (*id.* at 41:7–42:15).

near the apartment building or over the buys themselves; Mitchell would either be the direct seller, or be there to send the CI to the correct window for the purchase. (*Id.* at 34:8–16.)

During this time, members of the Narcotics Unit were also following Mitchell, and they observed that on both February 20, 2023, and February 22, 2023, Mitchell drove to MetroClub Condominiums in the morning and returned to Griscom Street in the afternoon. (*Id.* at 34:16–21.) After obtaining a mobile tracking device for Mitchell's car on March 9, 2023, the officers learned that MetroClub was one of Mitchell's most frequent stops. (*Id.* at 34:24–35:2.) The officers then approached MetroClub's building personnel to request surveillance camera footage on the days Mitchell's car had been there so that the officers could determine where he went upon entering the building. (*Id.* at 35:2–8.) That footage showed Mitchell taking a special elevator that went only to the ninth floor, where he would then exit the elevator, turn, and walk the same direction each time. (*Id.* at 35:8–14.)

Within the cluster of apartments in that direction was Unit 912, which was known to the building personnel as being rented by a man known as "Mike Rols." (*Id.* at 35:15–17.) Two of the building's surveillance videos showed Mitchell leaving the ninth floor with "Mike Rols." (*Id.* at 35:17–21.) After reviewing email communication between the occupant of Unit 912 and building management, the officers determined that the name of the person living in that unit was actually Kareem Barksdale. (*Id.* at 36:3–6.) The officers used the Pennsylvania Department of Transportation ("PennDOT") system to find Barksdale's driver's license photo and confirmed that he was the man going by "Mike Rols." (*Id.* at 36:7–10.)[2]

---

[2] Multiple witnesses identified Barksdale, based on his driver's license photo and other pictures of him, to be the man living in Unit 912. (Plea Hr'g. Tr. at 39:13–39:22; *see also id.* at 39:22–41:2 (confirming further that Barksdale was the resident of Unit 912 through video surveillance showing him going toward that apartment on the ninth floor and, subsequently, moving out of that apartment).)

Using the information obtained from their surveillance, the officers obtained search warrants for multiple addresses, including Unit 912 and the Griscom Street apartments, along with a black Subaru associated with Barksdale.  (*Id.* at 36:11–16.)  When they executed the warrant for Unit 912, the officers found Barksdale in the bedroom of the unit.  (*Id.* at 36:22–37:20.)  They also recovered $270,000 in cash, almost nine pounds of marijuana, tally sheets, 1,104 grams of PCP, two loaded firearms, and loose ammunition.  (*Id.*)  And they found Barksdale's driver's license, debit cards, keys to a black Subaru,[3] and electronic devices—which contained pictures of Barksdale in the unit on other dates.  (*Id.* at 37:24–38:11.)  When the officers searched the Griscom Street apartments, they found PCP in a container identical to those found at Unit 912 (a big bottle with a "Motts" label).  (*Id.* at 38:18–39:2.)  Likewise, some of the marijuana recovered at the Griscom Street apartments was packaged in foil labeled "cheetah piss," which was itemized on the tally sheets recovered from Unit 912.  (*Id.*)

## B.      Barksdale's Indictment, Guilty Plea, and Sentencing

On August 30, 2023, a federal grand jury returned an indictment charging Defendant Kareem Barksdale with intent to distribute over one kilogram of PCP and marijuana in violation of 21 U.S.C. §§ 841(a)(1), (b)(1)(A), and (b)(1)(D) (Counts I and II), possession of a firearm in furtherance of drug trafficking in violation of 18 U.S.C. § 924(c) (Count III), and possession of a firearm as a felon in violation of 18 U.S.C. § 922(g)(1) (Count IV).  (*See* Doc. No. 1 at 1–4.)  Throughout the prosecution, Barksdale was represented by Anthony J. Petrone, Esquire.

On January 23, 2024, Barksdale filed a motion to suppress physical evidence seized during the execution of the search warrant for Unit 912, the black Subaru, and "all tainted

---

[3] The officers were able to match the keys to the vehicle that Barksdale had been seen driving to and from the MetroClub Condominiums.  (Plea Hr'g. Tr. at 38:8–13 *Id.* at 38:8–13 (noting only "mail in the name of Kareem Barksdale" as the evidence found in the black Subaru's search); Doc. No. 31 at 5–6.)

evidence derivatively obtained as a result of the searches," arguing violations of his rights under the Fourth Amendment.  (*See* Doc. No. 20 at 2.)  Barksdale asserted that "the supporting affidavits failed to show that there was [probable cause] of criminal activity" in either location searched and that "the good faith exception to the exclusionary rule"[4] did not apply because "probable cause was so lacking that no well-trained officer could reasonably believe that the warrants were valid." (*Id.* at 13.)  The Government filed a response on February 5, 2024, and, following a suppression hearing, both parties filed supplemental briefs on March 12 and March 18, 2024, respectively.  (*See* Doc. Nos. 22, 29, 30; *see also* Doc. No. 27.)  On March 26, 2024, the Court denied Barksdale's motion to suppress finding that the facts alleged in the probable cause affidavit created the "fair probability" of criminal activity required for a valid warrant for both Unit 912 and the black Subaru.  (*See* Doc. No. 31 at 10 (explaining that "[n]umerous pieces of evidence connected the drug dealing on Griscom Street with Unit 912).)  In the alternative, the Court concluded that even if probable cause were found to be lacking, the good faith exception would apply here, where Barksdale failed to establish the "rare circumstances" that would render the affidavit "so flawed that the officers were not justified in reliance on it."  (*See id.* at 14, 18.)

On April 11, 2024, Barksdale pleaded guilty to Counts I, II, and IV in the indictment pursuant to a plea agreement (Doc. No. 34-1), and the Court accepted his plea, finding that the plea was "knowing and voluntary" (Plea Hr'g. Tr. at 45:9–19).  As part of the plea agreement, the Government agreed to dismiss Count III of the indictment (*See* Doc. No. 34-1 at ¶ 2(a)), therefore dropping Barksdale's mandatory minimum sentence from fifteen years' imprisonment

---

[4] Under the good faith exception, a "court should not suppress evidence seized under a warrant's authority, even if the warrant is subsequently invalidated, unless a reasonably well trained officer would have known that the search was illegal despite the magistrate's authorization." *United States v. Stearn*, 597 F.3d 540, 561 (3d Cir. 2010) (quotation marks omitted).

to ten years' imprisonment (*see* Doc. No. 61 at 4).[5]  And the Court ultimately sentenced Barksdale to 150 months' imprisonment and five years' supervised release.  (Doc. No. 51.)

### C.    Habeas Petition

The Court entered Judgment in Barksdale's case on September 24, 2024.  (*Id.*)  Because Barksdale did not appeal his conviction or sentence, the Judgment became final for habeas purposes fourteen days later, on October 8, 2024.  *See United States v. Gordon*, Crim. No. 09-020-1, 2014 WL 5502817, at *1 (D.N.J. Oct. 28, 2014) ("As defendant did not file a direct appeal from his judgment and conviction, his judgment became final for § 2255 purposes fourteen days after the judgment was entered on September 19, 2011.").  Just under a year later, on September 21, 2025, Barksdale timely filed the pending Motion to Vacate, Set Aside, or Correct a Sentence under 28 U.S.C. § 2255.  (Doc. No. 54); *see* 28 U.S.C. § 2255(f)(1) ("A 1-year period of limitation shall apply to a motion under this section.  The limitation period shall run from the latest of . . . the date on which the judgment of conviction becomes final.").

Barksdale's petition focuses on his belief that his trial attorney, Attorney Petrone, withheld information pertaining to the status of a specific piece of video evidence.  (*See* Doc. No. 54-1 at 2.)  The video at issue is surveillance footage taken from a pole camera that the investigating officers set up on Griscom Street.  (*See* Doc. No. 61 at 3.)  The pole camera evidence—which is referenced only once in the probable cause affidavit—shows "Mitchell

---

[5] As part of the plea agreement, Barksdale "knowing[ly] and voluntar[ily] waive[d] the right to appeal or collaterally attack the conviction and sentence" and "expressly waive[d] the right to raise on appeal or on collateral review any argument that [the pleaded to statutes] are unconstitutional and [any argument that the] admitted conduct does not fall within the scope of the statutes."  (Doc. No. 34-1 at ¶ 14.)  One relevant exception to this waiver provision was that Barksdale could bring a claim on appeal or collateral review that "an attorney who represented the defendant during the course of this criminal case provided constitutionally ineffective assistance."  (*Id.*)

carrying [a] black trash bag into [the Griscom Street apartments] a short time [ ] after leaving the Metro Club Condos" on March 17, 2023.  (Doc. No. 20-1 at 13.)

Barksdale asserts that in the state prosecution against Mitchell, the prosecutors "indicated that the pole camera evidence in the case was inexplicably missing or destroyed" and the state matter was subsequently dismissed with prejudice.  (Doc. No. 54-1 at 2.)  Barksdale alleges that Mitchell's attorney in the state case, "disclos[ed] the problems with the missing pole camera footage" to Attorney Petrone.  (*Id.*)  Based on this, Barksdale argues in his § 2255 petition that Attorney Petrone rendered ineffective assistance because he knew the footage was missing, failed to bring arguments at the motion to suppress stage pertaining to the missing footage, and failed to tell Barksdale about the missing footage before the plea hearing.  (*Id.* at 2–3.)

## II.    DISCUSSION

Barksdale challenges his conviction on the grounds that his trial counsel rendered ineffective assistance during his criminal proceedings, resulting in a denial of Barksdale's Sixth Amendment right to counsel.  (Doc. No. 54-1 at 2.)

### A.    Legal Standard

Under 28 U.S.C. § 2255, a federal prisoner "claiming the right to be released upon the ground that the sentence was imposed in violation of the Constitution or laws of the United States, or that the court was without jurisdiction to impose such sentence, or that the sentence was in excess of the maximum authorized by law, or is otherwise subject to collateral attack, may move the court which imposed the sentence to vacate, set aside or correct the sentence." Ineffective assistance of counsel claims, like those brought by Barksdale in this case, are properly raised in a § 2255 motion.  *See United States v. Nahodil*, 36 F.3d 323, 326 (3d Cir. 1994) ("A § 2255 motion is a proper and indeed the preferred vehicle for a federal prisoner to allege ineffective assistance of counsel.").

6

"The Sixth Amendment recognizes . . . the right to the effective assistance of counsel." *See Strickland v. Washington*, 466 U.S. 668, 685–86 (1984).  To show that counsel was constitutionally ineffective under the Sixth Amendment, a defendant must show: (1) "counsel's performance was deficient"; and (2) "the deficient performance prejudiced the defense." *Id.* at 687; *see also United States v. Booth*, 432 F.3d 542, 546 (3d Cir. 2005) ("[A] criminal defendant may demonstrate that his representation was constitutionally inadequate by proving: (1) that his attorney's performance was deficient, i.e., unreasonable under prevailing professional standards; and (2) that he was prejudiced by the attorney's performance.").

Under the first prong, counsel's performance was deficient if he "made errors so serious that counsel was not functioning as the 'counsel' guaranteed the defendant by the Sixth Amendment." *Strickland*, 432 F.3d at 687.  The broad phrase "effective assistance" encompasses an attorney's "overarching duty to advocate the defendant's cause and the more particular duties to consult with the defendant on important decisions and to keep the defendant informed of important developments in the course of the prosecution." *Id.* at 688.  "[C]ounsel is strongly presumed to have rendered adequate assistance and made all significant decisions in the exercise of reasonable professional judgment." *Id.* at 690.

Under the second prong, the defendant establishes prejudice by "show[ing] that there is a reasonable probability that, but for counsel's unprofessional errors, the result of the proceeding would have been different." *Id.* at 694.  In other words, an "error by counsel, even if professionally unreasonable, does not warrant setting aside the judgment of a criminal proceeding if the error had no effect on the judgment." *Id.* at 691.  If the defendant entered a guilty plea, the prejudice prong considers whether "counsel's constitutionally ineffective performance affected the outcome of the plea process." *Hill v. Lockhart*, 474 U.S. 52, 58 (1985).

The Third Circuit has "endorsed the practical suggestion in *Strickland* to consider the prejudice prong before examining the performance of counsel prong 'because this course of action is less burdensome to defense counsel.'" *Booth*, 432 F.3d at 546 (quoting *United States v. McCoy*, 410 F.3d 124, 132 n.6 (3d Cir. 2005)).

### B.    Analysis

Barksdale challenges his conviction, arguing that Attorney Petrone rendered ineffective assistance when he failed to inform the Court about the allegedly missing pole camera footage in connection with the motion to suppress and when he failed to inform Barksdale about the missing footage before Barksdale pleaded guilty.  (Doc. No. 54-1 at 2.)  The Government argues that even if the Court assumes that defense counsel knew about the missing evidence before Barksdale's suppression and change of plea hearings and that counsel's failure to disclose that fact was deficient performance, Barksdale's claims nevertheless fail because he has not shown he was prejudiced by counsel's alleged failures.  (Doc. No. 61.)  The Court agrees with the Government.  Barksdale cannot "demonstrate a reasonable probability that, but for counsel's ineffectiveness," the Court would have granted his motion to suppress or "he would have opted to exercise [the right to trial]." *Vickers v. Superintendent*, 858 F.3d 841, 857 (3d Cir. 2017).  Even taking as true Barksdale's allegations that his defense counsel knew about "the issues with the missing pole camera footage," if Attorney Petrone had acted on this small piece of evidence, the outcome of the motion to suppress and the plea hearing would remain unchanged given the quantity and quality of other evidence against Barksdale, as well as the substantial benefit he gained from pleading guilty.  (Doc. No. 54-1 at 3); *see Hill*, 474 U.S. at 57–58; *Wilson v. Russo*, 212 F.3d 781, 789–90 (3d Cir. 2000).

### 1.    The Motion to Suppress

First, Barksdale argues that he was prejudiced in connection with his motion to suppress

because Attorney Petrone failed to disclose the pole camera footage was missing despite the fact this footage was used in the search warrant's affidavit of probable cause. (*See* Doc. No. 54-1 at 3 (asserting that the footage "impacts the credibility of the affiant as well as the four corners of the affidavit of probable cause")).) To make out a claim for ineffective assistance of counsel based upon an attorney's alleged error during the course of a legal proceeding—here, the motion to suppress—Barksdale must demonstrate that "but for counsel's unprofessional errors, the result of the proceeding would have been different." *Lee v. United States*, 582 U.S. 357, 364 (2017) (citations omitted). Barksdale argues that the Court's ruling on suppression would have been different because counsel could have requested a *Franks* hearing in relation to the missing pole camera footage. (*See* Doc. No. 54-1 at 5–6.) The Court is not convinced.

When litigating a motion to suppress, defense counsel may request a *Franks* hearing if they suspect that a "false statement knowingly and intentionally, or with reckless disregard for the truth was included by the affiant in the warrant affidavit." *Franks v. Delaware*, 438 U.S. 154, 155–56 (1978). But even assuming that Barksdale's counsel knew about the missing pole camera footage, a *Franks* hearing would not have been the proper challenge under the circumstances. *See id.* For one, there is nothing to suggest the footage was missing when it was referenced in the affidavit, or that the affiant was lying when he discussed the footage. (*See* Doc. No. 54-1 at 5–6; Doc. No. 31 at 6); *see Wilson v. Russo*, 212 F.3d 781, 787–88 (3d Cir. 2000) (explaining that the process under *Franks* starts by identifying details that are included in, or omitted from, the affidavit with reckless disregard for the truth).

For another, the footage itself was not "material, or necessary, to the finding of probable cause." *Wilson*, 212 F.3d at 789 (explaining that the next step in the *Franks* inquiry requires the court to "excise the offending inaccuracies and insert the facts recklessly omitted, and then

9

determine whether or not the corrected warrant affidavit would establish probable cause").  In the Memorandum denying Barksdale's motion to suppress, this Court clearly outlines the evidence within the affidavit tying Barksdale to the crimes.  (*See* Doc. No. 31 at 10–14 (finding a "fair probability" based on the included facts that evidence of a crime would be found at Barksdale's apartment).)  Specifically, the Court notes Mitchell's continuous visits to the ninth floor of the MetroClub Condominiums, while carrying various bags, in many instances accompanied in and out of the building by Barksdale, which police observed through numerous forms of surveillance.  (*See* Doc. No. 31 at 14–15 (explaining that "[b]ased on observation, security footage, and conversations with MetroClub Condo Management," officers could reasonably determine that Barksdale was associated with Mitchell who was "carrying drugs and other contraband back and forth between [ ] Griscom Street and the Metro Club Condos").)  Although the Court briefly references the pole camera footage when discussing Mitchell's movements on March 17 2023 (*see id.* at 11), that footage is simply one piece of evidence supporting the affiant's account of that day,[6] and March 17 was one day among many when the

---

[6] Specifically, the Court states:

> Officers later reviewed surveillance footage from Friday, March 17, 2023, which showed Mitchell walking into the lobby of the Metro Club Condos, turning left towards units 909, 910, 911, and 912, and returning a short time later holding a black trash bag and gray and black shoe box, which he subsequently carried into 5018 Griscom Street.

(Doc. No. 31 at 11.)  This portion of the Memorandum summarizes two paragraphs from the probable cause affidavit, one of which references the pole camera footage:

> Day Eighteen # 18
>
> 1. On March 20th 2023 officers observed Mitchell return to the Metro Condos. Officers reviewed surveillance footage from Friday March 17th 2023, which shows Mitchell again walking into the lobby of the Metro Club Condos after parking Target #1 Vehicle out front. Mitchell exits the elevators and walks the same direction toward the left where condos 919, 910, 911, and 912 are located. Mitchell returns a short time later holding a black trash bag and a gray and black shoe box. Mitchell was observed placing the trash bag and shoe box into Target Vehicle #1.

officers observed Mitchell speaking with Barksdale or leaving Unit 912 with a suspicious package (*see id.* at 10–12 (detailing similar interactions on March 15, 16, 18, and 23)). Therefore, if the Court had performed a *Franks* inquiry and excised the *one* mention of the pole camera footage within the fifteen pages of the affidavit, sufficient probable cause still would have existed and the Court's ruling denying the motion to suppress would have been the same. (*See id.* at 14; Doc. No. 61 at 16.)

In short, Barksdale has not shown a *Franks* motion was warranted, and even if the Court had held a *Franks* motion, Barksdale would not have succeeded considering the now-missing evidence is but an iota in comparison to the voluminous quantity and quality of other evidence that establishes probable cause within the affidavit.  (*See* Doc. No. 20-1 at 2–18; Doc. No. 31 at 10–14.)  Therefore, Attorney Petrone's failure to discuss the missing pole camera footage when litigating the motion suppress cannot be deemed prejudicial for purposes of Barksdale's ineffective assistance of counsel claim.  (*See* Doc. No. 54-1 at 5–6); *see also United States v. Vines*, 134 F.4th 730, 740 (3d Cir. 2025) (explaining that "counsel's failure to raise a meritless argument [will not be treated] as prejudicial").[7]

### 2.     The Guilty Plea

Next, Barksdale contends that he "most definitely" would not have pleaded guilty if he had been aware that the pole camera footage was missing, and therefore, Attorney Petrone

---

2. At approx. 5:36 p.m. officers reviewed the police pole camera police deployed at 5016–18 Griscom St. which showed Mitchell carrying the black trash bag into 5016–18 Griscom St. a short time later after leaving the Metro Club Condos.

(Doc. No. 20-1 at 13 (cleaned up).)

[7] In this section, Barksdale also make a passing reference to the doctrine outlined in *Brady v. Maryland*, 373 U.S. 83 (1963).  (*See* Doc. No. 54-1 at 5–6 ("The missing evidence should have generated grounds for a 'Franks' hearing and discussion of any 'Brady' duties or violations.").)  But he does not explain this argument or otherwise discuss *Brady*, so the Court does not consider this issue further.

provided ineffective assistance when he failed to disclose the issue to Barksdale before the guilty plea hearing.  (*See* Doc. No. 54-1 at 4.)  To prove that counsel's performance was so deficient and prejudicial that it undermined the "voluntary and intelligent" nature of a guilty plea, a defendant show both that "counsel's representation fell below an objective standard of reasonableness" and that the "particular errors of counsel [ ] actually had an adverse effect on the defense." *Hill*, 474 U.S. at 58 (citations omitted).  Here, even assuming that counsel's performance was deficient, Barksdale cannot show that Attorney Petrone's failures prejudiced Barksdale in connection with his guilty plea.

Even assuming Attorney Petrone knew about the missing footage and shared that fact with Barksdale, counsel would still have recommended that Barksdale plead guilty—and Barksdale would have done so—given the large sum of evidence against Barksdale and the substantial benefit that he gained from accepting the C-plea, including the Government's agreement to dismiss the § 924(c) count.  (Doc. No. 34-1; *see* Doc. No. 61 at 20 (explaining generally the stipulations in the plea agreement)); *see Vickers*, 858 F.3d at 857 (overturning the district court's finding of ineffective assistance where the record was "devoid of any credible evidence that [defendant] otherwise would have opted for a jury trial"); *cf. Hill*, 474 U.S. at 59 (explaining that when counsel's alleged error is a failure to investigate or discover potentially exculpatory evidence, the determination of prejudice turns on the objective "likelihood that discovery of the evidence would have led counsel to change his recommendation as to the plea").

In addition to the evidence tying Barksdale and Unit 912 to Mitchell and the drug operations at the Griscom Street apartments, when the officers executed the search warrant for Unit 912, they found Barksdale in the unit with $270,000 in cash, almost nine pounds of marijuana, tally sheets, 1,104 grams of PCP, two loaded firearms, and loose ammunition.  (Plea

Hr'g. Tr. at 36:22–37:20.)  Because the Court denied Barksdale's suppression motion, much (if not all) of this evidence could have been introduced against him at trial and would have strongly suggested his guilt to the jury.  There was thus little to be gained by Barksdale from going to trial.  Moreover, in exchange for Barksdale accepting the plea deal, the Government agreed that it would:  (1) dismiss the charge for violation of 18 U.S.C. § 924(c), thereby lowering his mandatory minimum sentence from fifteen years' imprisonment to ten years' imprisonment, and (2) recommend a term of imprisonment of twelve-and-a-half years at sentencing.  (*See* Doc. No. 61 at 20); *see also Lee*, 582 U.S. at 367 ("[A] defendant facing such long odds will rarely be able to show prejudice from accepting a guilty plea that offers him a better resolution than would be likely after trial.").

Although Barksdale now asserts that his plea decision would have been different if he had known the pole camera footage was missing, the Court cannot "upset a guilty plea solely because post hoc assertions from a defendant about how he would have pleaded but for his attorney's deficiencies."  *Lee*, 582 U.S. at 369 (instructing that "[j]udges should [] look to contemporaneous evidence to substantiate a defendant's expressed preferences").  Barksdale has not shown that the pole camera evidence was something he considered when weighing whether to go to trial versus take a plea.  (*See* Doc. No. 54-1 at 4.)  *Compare Hill*, 474 U.S. at 60 (holding that a plea would not be overturned where the defendant "alleged no special circumstances that might support the conclusion that he placed particular emphasis on his parole eligibility in deciding whether or not to plead guilty")*, with Lee*, 582 U.S. at 367 (holding that knowledge of whether deportation would follow a plea was "*the* determinative issue in [defendant's] decision to accept the plea deal").  And it would be wholly unreasonable to assume that the pole camera

footage weighed strongly in Barksdale's considerations, given the extent of other evidence against him.

In short, Barksdale has not convinced this Court through the bare allegations in his Petition that an "alternate decision [to reject the plea agreement] would have been rational under the circumstances." *Jackson v. Superintendent Graterford SCI*, 721 Fed. Appx. 128, 132 (3d Cir. 2018).  His concern for the missing footage now is not a strong enough allegation to overturn a plea that, from the whole of the evidence, was both beneficial to Barksdale and a reasonable choice under the circumstances.  *See Hill*, 474 U.S. at 57, 60.

## III.    CONCLUSION

Although Barksdale asserts two avenues for this court to find ineffective assistance of counsel, he cannot succeed on either.  (*See* Doc. No. 54-1 at 4–6 (alleging ineffective assistance at both the motion to suppress and plea agreement stages of the legal proceedings).)  Barksdale's central claim relates to a piece of evidence that was shown to be insignificant in the Court's denial of the suppression motion and would not have affected Barksdale's decision to accept the plea agreement.  (*See* Doc. Nos. 31, 34-1.)  Because Barksdale has not demonstrated that the outcome of the legal proceedings would have been different but for counsel's ineffective assistance, he has failed to make the proper showing required for this Court to find prejudice under *Strickland*'s standards.  *See Strickland*, 432 F.3d at 691.  Therefore, Barksdale has failed to show that he is entitled to habeas relief.

Because it is clear from "the motion and files and records of the case . . . that the movant is not entitled to relief," the Court need not hold an evidentiary hearing.  *United States v. Booth*, 432 F.3d 542, 545–46 (3d Cir. 2005) (quotation marks omitted).  Barksdale's § 2255 motion is denied.  Because jurists of reason would not debate the substantive disposition of his claims,

14

there is no probable cause to issue a certificate of appealability. *See Slack v. McDaniel*, 529 U.S. 473, 484 (2000). An appropriate Order follows.